

**SIGNED this 19 day of July, 2015.**

*Austin E Carter*

**Austin E. Carter**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 14-11805-AEC |
| Charles Clarence Bradford and | ) | |
| Jennifer Lynn Bradford, | ) | |
| | ) | Chapter 13 |
| Debtors. | ) | |
| | ) | |
| | ) | |
| Charles Clarence Bradford and | ) | |
| Jennifer Lynn Bradford, | ) | |
| | ) | |
| Movants, | ) | |
| | ) | |
| v. | ) | Contested Matter |
| | ) | |
| United States Department of the Treasury – | ) | |
| Internal Revenue Service, | ) | |
| | ) | |
| Respondent. | ) | |

<u>Before</u>

Austin E. Carter

United States Bankruptcy Judge

<u>Counsel</u>:

For Debtors:                          Margaret R. Smith
305 S. West Street
Bainbridge, Georgia 39819

For Respondent:                  Bruce T. Russell
U.S. Department of Justice
Ben Franklin Station
P.O. Box 14198
Washington, D.C. 20044

Barbara G. Parker
Assistant United States Attorney
Middle District of Georgia
P.O. Box 1702
Macon, Georgia 31202

## MEMORANDUM OPINION

This contested matter comes before the Court on the Debtors' objection to a claim filed by the Department of the Treasury – Internal Revenue Service (the "IRS"). The Debtors objected to the priority asserted by the IRS regarding a portion of its claim, to which objection the United States of America, on behalf of the IRS, responded. The Court held a hearing on this matter April 14, 2015; the aforementioned parties appeared at the hearing and argued for their respective positions.

Proceedings regarding the allowance or disallowance of claims are core proceedings under 28 U.S.C. § 157(b)(2)(B). The Court states its findings of fact and conclusions of law separately pursuant to Federal Rule of Civil Procedure 52, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7052 via Bankruptcy Rule 9014.

### FINDINGS OF FACT

The parties stipulated to the following facts, which the Court adopts as its findings. The IRS timely filed its proof of claim in this Chapter 13 case for unpaid income taxes and associated charges. The proof of claim, as amended, asserts priority status as to $36,385.00 owed pursuant to I.R.C. § 72(t)[1] due to the early withdrawal by one of the Debtors from an Individual Retirement Account ("IRA") (such amount referred to hereinafter as the "Exaction"). The IRS asserts that the Exaction is entitled to priority pursuant to § 507(a)(8) of the Bankruptcy Code,[2] either as an income tax (§ 507(a)(8)(A)) or, alternatively, as a penalty compensating the government for actual pecuniary loss (§ 507(a)(8)(G)). The Debtors contend that the Exaction is a penalty not in compensation for actual pecuniary loss, and thus not entitled to priority under § 507.

---

[1]   All references herein to "I.R.C." and the "Tax Code" relate to Title 26 of the United States Code (hereinafter, "U.S. Code").

[2]   Unless otherwise indicated, all references herein to "section" or "§" refer to a corresponding section of the Bankruptcy Code, and all references to the "Bankruptcy Code" relate to the corresponding sections of Title 11 of the U.S. Code.

CONCLUSIONS OF LAW

## I.   Statutory Framework.

Section 502 is the foundation for determining whether a claim is allowed in a bankruptcy case.  According to § 502, "[a] claim . . . , proof of which is filed under section 501 . . . , is deemed allowed, unless a party in interest . . . objects," and "if such objection to a claim is made, the court . . . shall allow such claim in such amount, except to the extent that" one of the nine specific disallowance provisions in § 502(b) applies. 11 U.S.C. § 502(a), (b).  Section 502(b)(1) provides for the disallowance of any claim to the extent that "such claim is unenforceable against the debtor and property of the debtor, under . . . applicable law . . . ." *Id.* § 502(b)(1).

Once a party in interest raises an objection pursuant to § 502(b)(1), the burden of proof is determined by applicable law. *In re Crutchfield*, 492 B.R. 60, 69 (Bankr. M.D. Ga. 2013) (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15, 21 (2000)).  Here, § 507, which governs priorities of claims in bankruptcy cases, is the applicable law;[3] accordingly, the burden of proof falls on the IRS. *See In re Firearms Imp. & Exp. Corp. v. United Capitol Ins. Co. (In re Firearms Imp. & Exp. Corp.)*, 131 B.R. 1009, 1015 (Bankr. S.D. Fla. 1991) (collecting burden of proof cases in relation to administrative expense priority).

In relevant part, § 507(a) states:

> (a) The following expenses and claims have priority in the following order:
>    . . .
>     (8) Eighth, allowed unsecured claims of governmental units, only to the extent that such claims are for–
>         (A) a tax on or measured by income or gross receipts for a taxable year . . . ;
>         . . . ; or
>         (G) a penalty related to a claim of a kind specified in this paragraph and in compensation for actual pecuniary loss.

11 U.S.C. § 507(a).  Priorities are narrowly construed to support the Bankruptcy Code's objective of equal distribution to similarly situated creditors: "Every claim granted priority status reduces

---

[3]     An exaction under IRC § 72(t) is treated as a tax rather than a penalty in determining the burden of proof under the Tax Code. *El v. Comm'r*, 144 T.C. 9 (2015).  Accordingly, if it were in question, the Debtors would have the burden of proof as to whether the Exaction is owed.  Here, however, the question is not whether the Exaction is owed, but rather whether the Exaction is entitled to priority under § 507(a)(8).  Therefore, the relevant burden of proof is determined under § 507.

the funds available to general unsecured creditors and may diminish the recovery of other claimants qualifying for equal or lesser priorities." *Howard Delivery Serv., Inc. v. Zurich Am. Ins. Co.*, 547 U.S. 651, 667 (2006).[4]  "[P]referential treatment of a class of creditors is in order only when clearly authorized by Congress." *Id.* at 655.  "The theme of the Bankruptcy Act is 'equality of distribution', and if one claimant is to be preferred over others, the purpose should be clear from the statute." *Nathanson v. NLRB*, 344 U.S. 25, 29 (1952) (citations omitted).  Among other reasons, the determination of priority status for claims is important in Chapter 13 cases because a debtor's plan must provide for the payment in full of allowed priority claims (unless the holder of the claim agrees to a different treatment). 11 U.S.C. § 1322(a)(2).

The IRS argues that the Exaction is a "tax on or measured by income or gross receipts for a taxable year" under § 507(a)(8)(A); in the alternative, it claims that the Exaction is a penalty in compensation of actual pecuniary loss under § 507(a)(8)(G).  Each of these theories supports the IRS's position that the Exaction is entitled to priority status.  The parties agree that if the Exaction does not fit into a subcategory of § 507(a)(8), it is not entitled to priority treatment under the Debtors' Plan.

I.R.C. § 72(t)(1) includes in a taxpayer's annual income tax an amount equal to 10% of any taxable distribution from an IRA, unless a listed exception applies (such additional 10% tax hereinafter referred to as the "I.R.C. § 72(t) Exaction"). 26 U.S.C. § 72(t)(1).  The most prominent exception in I.R.C. § 72(t) excepts distributions made on or after the taxpayer reaches 59 ½ years of age, *id.* § 72(t)(2)(A)(i); all other such distributions are often called "early" or "premature" distributions (or withdrawals).[5]  In addition to the taxpayer-age exception, I.R.C.

---

[4]     *See also Ohio Bureau of Workers' Comp. v. Yoder (In re Suburban Motor Freight, Inc.)*, 36 F.3d 484, 487 (6th Cir. 1994) (applying this principle to § 507(a)(8)).

[5]     *See, e.g., Rousey v. Jacoway*, 544 U.S. 320, 332 (2005) ("[T]he Internal Revenue Code permits penalty-free early withdrawals in certain limited circumstances . . . ."); S. Rep. No. 99-313, at 612-13 (1978) ("[T]he committee believes it appropriate to apply an early withdrawal tax to all tax-favored retirement arrangements."); 33A Am. Jur. 2d *Federal Taxation* ¶ 8321 ("A 10% penalty is imposed on premature distributions (early withdrawals) from qualified plans, including IRAs. (internal citations omitted); Bennett et. al., *Taxation of Distrib. from Qualified Plans* ¶ 12.03[1] (2015) ("The most significant exception to the tax is for any distribution made on or after the date on which an individual has reached age 59 ½. . . .  That is why the tax is known as the 'premature' or 'early' distributions tax." (emphasis omitted)); Bittker, McMahon & Zelenak, *Fed. Income Taxation of Individuals* ¶ 40.05 (2015) ("Section 72(t) generally imposes a 10 percent penalty tax on withdrawals from an IRA before age 59 ½.").

§ 72(t) has exceptions for distributions made after a taxpayer's death or disability, to pay for a

taxpayer's medical expenses, to help pay for a taxpayer's first home, and to satisfy a state order

of domestic support or property settlement, among others. *See id.* § 72(t)(2).

## II.    Case Law.

Although the Tax Code labels the I.R.C. § 72(t) Exaction a "tax" which seemingly falls

within the ambit of § 507(a)(8)(A) (as it is "on or measured by income or gross receipts for a

taxable year"), the parties agree that this Court must look beyond statutory labels. The parties

are correct on this point; in *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, the

Supreme Court definitively settled this question. *See* 518 U.S. 213, 224 (1996) ("In sum, we

conclude that the 1978 Act reveals no congressional intent to reject generally the interpretive

principle that characterizations in the Internal Revenue Code are not dispositive in the

bankruptcy context, and no specific provision that would relieve us from making a functional

examination of [the exaction in question].").[6]

Here, however, the parties' agreement ends. The Debtors urge the Court to follow *In re

Cassidy*, in which the United States Court of Appeals for the Tenth Circuit rejected contentions

that the I.R.C. § 72(t) Exaction was entitled to § 507(a)(8) priority either as an income tax or a

penalty in compensation for actual pecuniary loss, holding instead that it was a non-pecuniary-

loss penalty.[7] 983 F.2d 161, 162-64 (10th Cir. 1992). The Debtors also cite in *In re Cespedes*, in

---

[6]    Although the IRS concedes that the Court must employ a functional analysis in determining whether the I.R.C. § 72(t) Exaction is a tax or penalty in the context of § 507(a)(8), it still argues that the I.R.C. § 72(t) Exaction's designation as a "tax" in I.R.C. § 72(t) and in the IRS's forms, in addition to its consistent treatment as a tax rather than a penalty under the Tax Code's burden of proof statute (see note 3, *supra*, and *El*, 144 T.C. 9 cited therein), should have substantial persuasive value. The IRS cites *Hardee v. IRS (In re Hardee)*, 137 F.3d 337 (5th Cir. 1998) for the proposition that this consistent designation by the court and enforcement agency specializing in interpreting and enforcing the Tax Code should carry special weight with the Court. However, even according the IRS and Tax Court plenary authority in interpreting I.R.C. § 72(t), the only thing proven is that the Tax Code and its application are internally consistent on the concept that the I.R.C. § 72(t) Exaction is a "tax" for the purposes of the Tax Code. Granting that this consistency should be considered a characteristic of the exaction which should be considered, the Court does not find it particularly helpful in determining whether the I.R.C. § 72(t) Exaction serves a *function* that entitles it to priority as a tax under the Bankruptcy Code. This argument is similar to the argument that was made (and rejected) in *Anderson, infra*, regarding the authority of state courts in interpreting their own laws, though repackaged in the robes of a federal agency and court.

[7]    When *Cassidy* was decided, § 507(a)(8)(A) was codified at § 507(a)(7)(A). *See CF & I*, 518 U.S. at 216 n.1. The IRS is incorrect in its assertion that *Cassidy* was determined in the context of excise taxes. *Compare* Supplemental Response of United States to Debtors' Objection to Claim at 6, *Bradford v. IRS (In re Bradford)*, No. 14-11805-AEC (Bankr. M.D. Ga. April 10, 2015), ECF No. 40, https://ecf.gamb.uscourts.gov/doc1/052015674757, *with In re Cassidy*, 953 F.2d at 162. However, it is of no

which the Bankruptcy Court for the Eastern District of North Carolina, on nearly identical facts, adopted *Cassidy*'s reasoning as consistent with the Supreme Court's ruling in *CF & I*. 393 B.R. 403 (Bankr. E.D.N.C. 2008).[8, 9]

Each of these cases held that the I.R.C. § 72(t) Exaction was not a tax and was not a penalty in compensation of actual pecuniary loss, and thus not entitled to priority. *In re Cassidy*, 983 F.2d at 164; *In re Cespedes*, 393 B.R. at 408.  The court in each case considered it necessary or helpful to examine the purpose underlying § 507(a)(8); in doing so, each court found that the I.R.C. § 72(t) Exaction contravened that purpose. *In re Cassidy*, 983 F.2d at 164 ("We . . . turn to bankruptcy policy."); *In re Cespedes*, 393 B.R. at 408 ("[V]iewing such an exaction as a non-tax renders a result that furthers the underlying purpose of the Bankruptcy Code." (quoting in agreement, *Mounier v. United States (In re Mounier)*, 232 B.R. 186, 193 (Bankr. S.D. Cal. 1998))).

The IRS raises numerous concerns with *Cassidy* and its progeny, each of which the Court attempts to address hereinafter; but, in the Court's view, the ultimate question presented is whether an exaction imposed primarily for the purpose of discouraging lawful prepetition debtor conduct is an exaction imposed "for the purpose of supporting the Government," as that phrase is used in *CF & I* and its ancestors, and so a "tax" within the meaning of § 507(a)(8). *See* 518 U.S. at 224.  The Court seeks to answer this question by examining *Cassidy* and *CF & I*, and addressing the cases on which these cases relied.

---

great importance which type of "tax" is being examined because the chief question presented is what the word "tax" means in § 507(a)(8), regardless of where in § 507(a)(8) the term is found—§ 507(a)(8)(A) (income tax), § 507(a)(8)(E) (excise tax), or otherwise. *See CF & I*, 518 U.S. at 220-23 (referencing numerous times, as dispositive question, whether exaction was "tax").

[8]    *Cespedes* is slightly different from *Cassidy* and this case because in it the IRS argued that the I.R.C. § 72(t) Exaction was an excise tax under § 507(a)(8)(E), rather than as an income tax under § 507(a)(8)(A).  However, as stated in note 7, *supra*, because the question turns on the definition of "tax," this difference is insignificant.

[9]    The Debtors also rely on *Mounier v. United States (In re Mounier)*, which addressed whether the I.R.C. § 72(t) Exaction should be considered a tax for the purpose of dischargeability in a Chapter 7 case. 232 B.R. 186 (Bankr. S.D. Cal. 1998).  The court in *Mounier* examined *CF & I* and *Cassidy* at some length, ultimately agreeing with those cases that the I.R.C. § 72(t) Exaction was a non-pecuniary-loss penalty rather than a tax. *Id.* at 192-93.

A.     *Cassidy*.

*Cassidy* was decided four years before *CF & I*.  In *Cassidy*, the Court rejected the IRS's

argument that the Tax Code's labeling of the I.R.C. § 72(t) Exaction as a "tax" finally

determined that the I.R.C. § 72(t) Exaction was a "tax" as that term is used in § 507(a)(8). 983

F.2d at 162.  The court supported its ruling by examining salient Supreme Court precedent under

section 64 of the 1898 Bankruptcy Act (determining priority under the Act) (hereinafter,

"section 64")—*United States v. New York*, 315 U.S. 510 (1942) [hereinafter *New York*]; *New

York v. Feiring*, 313 U.S. 283 (1941) [hereinafter *Feiring*]; and *New Jersey v. Anderson,* 203

U.S. 489 (1906)—and a case determined under section 17a of the Bankruptcy Act of 1898

(determining dischargeability under the Act) (hereinafter, "section 17a")—*United States v.

Sotelo*, 436 U.S. 268 (1978). *In re Cassidy*, 983 F.2d at 162-63.

After examining these cases, the *Cassidy* court cited a commonly used, four-factor

"functional analysis" for defining a "tax." *In re Cassidy*, 983 F.2d. at 163.  This test was derived

from *Feiring* by the United States Court of Appeals for the Ninth Circuit, and it was first applied

by that court in the context of § 507 in *County Sanitation District No. 2 of Los Angeles County v.

Lorber Industries of California, Inc. (In re Lorber Industries of California, Inc.)*, 675 F.2d 1062

(9th Cir. 1982) (such test hereinafter the "*Lorber/Feiring* test").  According to the

*Lorber/Feiring* test, a tax is: "(1) an involuntary pecuniary burden, regardless of name, laid upon

individuals or property; (2) imposed by, or under authority of the legislature; (3) for public

purposes, including the purposes of defraying expenses of government or undertakings

authorized by it; (4) under the police or taxing power of the state." *In re Cassidy*, 983 F.2d. at

163.  Because in *Cassidy* there was no dispute as to the satisfaction of factors one, two, and four,

the court focused on the third factor—the "public purposes" factor—first examining the

legislative history of I.R.C. § 72(t). *Id*. at 164.  Upon finding multiple purposes for the exaction,

the court determined that the legislative history was too equivocal to resolve the question. *Id*.

The court then examined the other characteristics of the I.R.C. § 72(t) Exaction—its self-

assessing nature, its effect of recapturing some lost tax benefits to the government, its statutory

designation as a tax, and its effect of deterring early withdrawals. *Id.* However, the court

determined that these considerations were also insufficient to resolve whether the I.R.C. § 72(t)

Exaction was a tax. *Id.*

The *Cassidy* court next looked to the reasons non-pecuniary-loss government penalties

are not entitled to priority under § 507(a)(8). *Id.* It determined that § 507(a)(8) embodies the

principle that claims based on exactions designed to punish or deter debtor conduct should not be

entitled to preferential treatment in a bankruptcy case. *Id.* (citing *Simonson v. Granquist*, 369

U.S. 38 (1962)). The *Cassidy* court, quoting the district court below, explained:

> "If the purpose of this additional tax is to deter the taxpayer from
> withdrawing amounts and everybody agrees that that's the purpose,
> then the deterrent effect will be diminished, at least, if not lost, by
> having the creditors rather than the taxpayer be the one to actually
> in the end pay for the early withdrawal.["]

> "If the additional amount is given priority over other creditors'
> claims, then that will subtract a large amount from the bankruptcy
> estate and it will discharge the debtor's liability on that additional
> tax; so in other words, the debtor does not bear the sanction as much
> as the unsecured creditors."[10]

*Id.* Based on this policy, the *Cassidy* court added to the *Lorber/Feiring* test that an exaction

imposed to deter a debtor's conduct is a "penalty" rather than a "tax" under § 507(a)(8). Because

the I.R.C. § 72(t) Exaction had the purpose and function of dissuading taxpayers from

withdrawing his or her retirement early, the court determined that it was not a tax entitled to

priority. *Id.* at 164.

The *Cassidy* court also rejected the government's argument that the I.R.C. § 72(t)

Exaction is a penalty that compensates the government for actual pecuniary loss by recouping

lost interest on the taxes that, absent the tax benefits afforded by the IRA, would have been

collectible from the taxpayer. *Id.* The court reasoned that because the I.R.C. § 72(t) Exaction—

---

[10]    Where the exaction in question is nondischargeable, entitling it to priority further undermines the exaction's function as a
deterrent because the amount paid as priority from estate assets in the debtor's bankruptcy case is an amount that cannot be later
collected from the debtor. This policy concern is exemplified in *Cassidy*, where the debtor (Lucius Cassidy) joined *with* the IRS
in arguing that the exaction should be entitled priority. *In re Cassidy*, 983 F.2d 161; *see also Mounier*, 232 B.R. at 193-94
(holding I.R.C. § 72 Exaction nondischargeable under those facts).

as a flat 10% amount of the taxable funds withdrawn—has no cognizable relationship to any lost government revenue, it was not intended to defray government loss, but rather to punish the taxpayer. *Id.* at 164-65.

**B.    *CF & I.***

The IRS argues that *Cassidy* and its progeny cannot be trusted because the functional analysis conducted by the Supreme Court in *CF & I* limits penalties, in distinction from taxes, to those exactions that are imposed for the purpose of deterring unlawful conduct.  According to the IRS, because making a nonqualified (early) withdrawal (triggering the I.R.C. § 72(t) Exaction) is lawful, the I.R.C. § 72(t) Exaction cannot be a penalty.  The IRS also seeks to undermine *Cassidy* and its progeny on the grounds that these cases, when viewed from the vantage point of *CF & I*, place too much weight on the policy underlying § 507(a)(8).[11]

In *CF & I*, the Supreme Court was presented with the question of whether an exaction imposed on an employer under I.R.C. § 4971—the amount of which was equal to 10% of the amount which the employer had failed to fund an employee pension plan—(hereinafter, the "I.R.C. § 4971 Exaction"), was a tax entitled to priority under § 507. 518 U.S. at 218.  The IRS argued that because the I.R.C. § 4971 Exaction was framed as a "tax" in the Tax Code, it was a tax entitled to priority. *Id.* at 219.  In rejecting the IRS's plain language argument, the Supreme Court observed that the Bankruptcy Act of 1898—which, as amended, was in effect until the passage of the Bankruptcy Code in 1978—had also entitled "taxes" to priority and that the courts had employed a "functional analysis" in determining what was, and was not, a "tax" under the Bankruptcy Act's priority statute. *Id.* at 220-21.  Because the Court, after study, found no indication that Congress intended to change this "functional analysis" in enacting the 1978 Bankruptcy Code, it held that the functional analysis formerly applied under the Act was the proper analysis for defining a "tax" under § 507(a)(8).[12] *Id.* at 221-24.

---

[11]    *See* note 14, *infra*.

[12]    In *CF & I*, as in *Cassidy*, current § 507(a)(8) is addressed under § 507(a)(7). *See CF & I*, 518 U.S. at 216 n.1; *see also* note 7, *supra*.

The *CF & I* Court summarized the functional analysis from three leading pre-1978 section 64 cases (also cited by *Cassidy*)—*New York*, *Feiring*, and *Anderson*: "a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the Government." 518 U.S. at 224. The Court then addressed what constitutes a penalty—the converse of a tax. The Court quoted an older case, defining "penalty" in the context of a punishment based on a violation of federal liquor law, for the proposition that "if the concept of a penalty means anything, it means a punishment for an unlawful act or omission." *Id*. at 222 (quoting *United States v. La Franca*, 282 U.S. 568, 572 (1931)). The Court determined that the behavior that gives rise to an I.R.C. § 4971 Exaction is unlawful, as exemplified by the private right of action granted to those injured thereby. *Id.* at 224-25. Next, the Court examined how the I.R.C. § 4971 Exaction fit into the structure of the Tax Code and found nothing that mitigated the I.R.C. § 4971 Exaction's punitive nature. *Id.* at 225. Finally, the Court examined the legislative history to I.R.C. § 4971 and noted that Congress intended it to serve as a deterrent. *Id.* The Court concluded that I.R.C. § 4971 Exaction had a "patently punitive function" and, as a penalty, could not be a tax. *Id.* at 226.

The IRS's first argument is that the final line of demarcation between a "tax" and "penalty" is whether the underlying conduct triggering the exaction is lawful.[13] The IRS supports this interpretation of *CF & I* and attempts to distinguish its holding from this case by citing *United States v. Juvenile Shoe Corporation of America (In re Juvenile Shoe Corporation of America*, 99 F.3d 898 (8th Cir. 1996). In *Juvenile Shoe*, the United States Court of Appeals for the Eighth Circuit held that a 15% exaction imposed under § 4980 of the Tax Code (labeled therein a "tax") on an employer for reverting overfunded pension plan contributions to itself was an excise tax rather than a penalty (such exaction hereinafter, the "Self-Reversion Exaction"). 99 F.3d at 903. The court reached this ruling even though the Self-Reversion Exaction was imposed in addition to ordinary corporate income taxes levied on the reverted amounts and was imposed

---

[13]    As will be addressed hereinafter, the IRS also argues that this distinction is mandated by the Supreme Court's decision in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012).

to reinforce a policy favoring overfunding rather than self-reversion, presumably to support pension fund stability. *Id.* at 901, 902.  The lynchpin of the court's decision was its interpretation of *CF & I* as defining penalty to "*require*[] that the exaction be imposed 'as punishment for an unlawful act.'" *Id.* at 902 (emphasis added).  Based on this interpretation, the court held that because the conduct triggering the Self-Reversion Exaction was lawful, the Self-Reversion Exaction could not be a penalty and was thus a tax.  *Id.*  The Eighth Circuit further distinguished the Court's holding in *CF & I* by noting that the conduct triggering the I.R.C. § 4971 Exaction (failure to fund a pension plan) does not deny the government any revenue, whereas the Self-Reversion Exaction recaptured the "earnings on the money that would have been taken as tax revenue at the corporate tax rate had it not been placed in the pension fund." *Id.* at 901, 902-03.  (As will be addressed hereinafter, the IRS argues that the I.R.C. § 72(t) Exaction is like the Self-Reversion Exaction because it recaptures the earnings on the taxes that, but for their tax-free contribution into the IRA, would have been collected.)

The IRS's second argument is that *CF & I* precludes the Court's decision from turning on a consideration of the policy embodied in § 507(a)(8), apparently because such a consideration would amount to an unwarranted addition to *CF & I*'s definition of tax as "a pecuniary burden laid upon individuals or property for the purpose of supporting the Government."[14]

The Court does not find either of these arguments compelling.  *CF & I* did not use the lawful-unlawful distinction as a blanket rule, exclusive of any other test, for distinguishing penalties from taxes.  As stated in *Cespedes*:

> In *CF & I*, the Supreme Court stated that it took "*La Franca*'s statement of the distinction to be *sufficient for the decision of this case*." *CF & I*, 518 U.S. at 224 (emphasis added).  Because the exaction in question in *CF & I* was related to an unlawful omission,

---

[14]   At the hearing, the IRS was inconsistent on this point.  Counsel for the IRS declared that the IRS is not arguing that "the Court should ignore the policy underlying § 507 of the Bankruptcy Code, which is designed to protect unsecured creditors from underwriting penalties that are imposed for the bad conduct of debtors." *See* Oral Argument at 35:17-31, *Bradford v. IRS (In re Bradford)*, No. 14-11805-AEC (Bankr. M.D. Ga. April 14, 2015), ECF No. 43, https://ecf.gamb.uscourts.gov/doc1/052015686420 (attached audio file).  However, the arguments of the IRS require the Court to ignore this policy.  For example, limiting the definition of penalty to exactions imposed on lawful conduct would effectively require creditors to underwrite the cost of exactions that are imposed on discouraged ("bad") conduct that is not unlawful. Indeed, the IRS argues that *Cassidy* and its progeny erred by placing too much weight on this policy consideration.

12

> *it was not necessary for the Court to consider whether a penalty could also apply to an act or omission that was lawful, but discouraged.*

*In re Cespedes*, 393 B.R. at 408 (second emphasis added) (parallel citations omitted). Accordingly, even if the *CF & I* Court's analysis had consisted solely of determining that the conduct giving rise to the I.R.C. § 4971 Exaction was unlawful, that case provides no reason to think that a purpose of punishing unlawful conduct is the *only* purpose inconsistent with the purpose of government support (and thus no reason to limit the definition of "penalty" to exactions imposed on unlawful conduct). Furthermore, the *CF & I* Court did not cease its inquiry upon determining that the conduct giving rise to the I.R.C. § 4971 Exaction was unlawful; to the contrary, employing established rules of statutory interpretation, the Court went on to examine how the I.R.C. § 4971 Exaction fit into the scheme of the Tax Code and to examine the provision's legislative history. 518 U.S. at 225-26. Accordingly, the *CF & I* Court's reference to the lawful-unlawful distinction is likely best viewed as a nonexclusive factor (though determinative in *CF & I* as to the I.R.C. § 4971 Exaction) in deciding whether an exaction has the purpose of supporting the government. For these reasons, *CF & I* does not preclude an examination of the policies embodied in § 507(a)(8) in assessing whether an exaction imposed to discourage certain lawful conduct is for the "purpose of supporting the Government," and thus, a tax.

In sum, the Court in *CF & I* did not establish a new standard, but rather affirmed the application of an old standard—the functional analysis historically employed by the Supreme Court in distinguishing taxes from penalties under the Bankruptcy Act of 1898. As noted above, *CF & I* directly relied on *Anderson*, *Feiring*, and *New York*, each of which was decided under the Bankruptcy Act's priority statute (section 64). *See CF & I*, 518 U.S. at 220-21, 224. The Court also relied by analogy on *Sotelo*, decided under the Act's discharge statute. *See CF & I*, 518 U.S. at 221, 222 n.6. It is accordingly helpful to examine these cases to understand this standard better, and the Court now does so.

**C.    Cases under the Bankruptcy Act of 1898—*Anderson*, *Feiring*, *New York*, and *Sotelo*.**

**(1)    *Anderson*.**

In *Anderson*, the Supreme Court, interpreting the term "tax" in section 64, determined whether a franchise exaction, sometimes termed as a "license fee," was a tax entitled to priority—despite differing terminology used to describe the exaction in the operative state statute and by the courts of that state—or a debt owed to the state arising from a contractual relationship and accordingly not entitled to priority. 203 U.S. at 490-94.[15]  Before addressing the debtor's arguments particularly, the Court established the principle that although the state court has plenary authority to determine the scope and manner of an exaction's application (in other words, its characteristics as applied), it is for the federal courts, in construing a federal statute, to determine whether those characteristics constitute a "tax" within the contemplation of Congress. *Id.* at 490-93 ("The state court may construe a statute and define its meaning, but whether its construction creates a tax within the meaning of a Federal statute, giving a preference to taxes, is a Federal question, of ultimate decision in this court.").  In this context, the Court observed that, "[g]enerally speaking, a tax is a pecuniary burden laid upon individuals or property for the purpose of supporting the government." *Id.* at 492.  This established, the Court rejected the debtor's argument that the franchise exaction was a contractual fee exchanged for the benefit of being able to incorporate in that state because of certain characteristics of the exaction that indicated its function as a tax to support the government.[16] *Id.* at 493.

Importantly, the Court in *Anderson* expressly stated that it was interpreting the priority statute in the context of the Bankruptcy Act and with the purpose of determining Congress's intent behind the term "tax" in that statute. *See, e.g.*, *id.* at 489 (noting that previous priority statute was "doubtless in the view of Congress when the present law was drafted"), at 491

---

[15]    The priority of nontax debt was apparently of considerable controversy under the Bankruptcy Act. *See In re Lorber Indus. of Cal., Inc.*, 675 F.2d at 1067 (discussing history).

[16]    These characteristics were that the franchise exaction (a) continued after incorporation, (b) could change in amount without any redress by the debtor, and (c) was imposed on preexisting corporations as well as corporations yet-unformed. *Anderson*, 203 U.S. at 493.

("[T]he *bankruptcy act* is a Federal statute, the ultimate interpretation of which is in the Federal

Courts." (emphasis added)), at 492 ("[W]hether [the state exaction as construed by the state

courts] creates a *tax within the meaning of a Federal statute*, giving a preference to taxes, is a

Federal question, of ultimate decision in this court." (emphasis added)), at 494 (addressing the

"intention of Congress").

**2)**    *Feiring.*

In *Feiring*, the Supreme Court, in the context of a New York sales tax, was once more

called on to distinguish between a tax and a contractual debt. 313 U.S. at 284.  The parties'

arguments centered on the fact that the sales tax at issue was a tax on the purchaser (as most

sales taxes are), though the seller had the responsibility to collect and remit the tax. *Id.* at 286-88.

The Supreme Court rejected the debtor's argument—that because the exaction was a tax on the

purchaser, it could not also be a tax on the seller—stating:

> [I]t is plain that both the vendor and the vendee are made liable for
> payment of the tax *in invitum* without regard to those provisions by
> which the seller may shift the incidence of the tax to the buyer and
> the tax may be summarily collected by distraint of the property of
> either the seller or the buyer.  *A pecuniary burden so laid upon the
> bankrupt seller for the support of government, and without his
> consent thus has all the characteristics of a tax entitled to priority
> of payment in bankruptcy within the meaning of § 64 of the
> Bankruptcy Act*.

313 U.S. at 287 (emphasis added).  As in *Anderson*, the Court was clear that the goal of its

analysis was to determine "the meaning of § 64 of the Bankruptcy Act," *id.*, looking to "the

terms and *purposes* of the Bankruptcy Act as establishing the criteria upon the basis of which the

priority is to be allowed," *id.* at 285 (emphasis added).

**(3)**    *New York.*

*New York* is of particular importance because it is the first in this line of cases where the

Court was called on to distinguish a tax from a penalty.[17]  In *New York*, the Court settled a

---

[17]    *New York*, as the only case cited in *CF & I* where the Supreme Court was called upon to distinguish between a tax and a
penalty under the priority statute, was fundamental to the Supreme Court's statement in *CF & I* that the government-support test

difficult question involving the interplay between state and federal taxes entitled to priority. 315 U.S. at 512.  Though contested by the State of New York, the Court, citing the (then-well-established) test set forth in *Anderson* and *Feiring*, decided that, just as with sales taxes, withholdings required under federal unemployment and retirement insurance laws were not unpaid contractual debts simply because the exaction was proximately imposed on the employee rather than the employer. *New York*, 315 U.S. at 515-16.

However, this was not the end of the Court's analysis.  The State of New York argued that a portion of the exaction was a penalty.  (At that time, a penalty would have been disallowed as a claim in a bankruptcy case. *Id.* at 513 n.4, 516.)  The State's argument was based on a credit allowed by the federal government on the federal unemployment insurance exaction; by that credit, the employer's federal tax liability would be reduced dollar-for-dollar (up to 90% of the obligation) by the amount that the employer contributed to a qualifying state unemployment fund. *Id.* at 516.  New York argued that because the 90% credit was available to offset the federal liability, only 10% of the tax was a true tax and the balance was a penalty (not in compensation for any actual pecuniary loss to the government) for failing to contribute to the state fund. *Id.*

The Court rejected this argument, reasoning that the unemployment burden borne by the federal and state governments was static and that, under the pertinent federal law, any unemployment not addressed by the state would necessarily fall on the federal government. *Id.* at 517.  Thus, regardless of to whom the exaction was paid, it ultimately supported the same burden; accordingly, 100% of the exaction was for the purpose of supporting the government. *Id.* *New York* established that a tax, in contrast to a penalty, must be an "effort by the United States to obtain . . . revenue;" in other words, monies collected for the purpose of supporting the government. *See id.*

---

was applied in "determining whether an exaction was a tax under § 64(a), or a *penalty* or a debt." *CF & I*, 518 U.S. at 224 (emphasis added).

**(4)**     *Sotelo*.

In *Sotelo*, the Court addressed whether an officer's liability as a "responsible party" for his company's failure to remit taxes withheld by his company on behalf of an employee should be interpreted as a "tax" excepted from discharge under section 17a of the Bankruptcy Act of 1898.[18] 436 U.S. at 270.  Even though the Tax Code called the liability a "penalty," the Court held that it was nondischargeable as a "tax" within the meaning of section 17a. *Id.* at 274-75. The Court's reasoning rested on two points:  First, the Court found that the undisputed "tax" nature of the funds when withheld from the employee does not change simply because such funds are recouped from an officer who was responsible for their remittance. *Id.* at 275.  Second, the Court relied heavily on the legislative history to section 17a. *Id.* at 275-79.  The Court's discussion of legislative history to, and the purpose of, the statute spans four pages in the official reporter, and the Court faulted the court below for failing to consider that history. *Id.*

**(5)**     **Conclusions based on *Anderson*, *Feiring*, *New York*, and *Sotelo*.**

*Anderson*, *Feiring*, and *New York* directly support the proposition that this Court should examine the purpose of the priority statute in determining the definition of "tax."  These cases set forth a functional analysis which examines the characteristics of the exactions in question to determine if they function as taxes, and as particularly relevant here, whether they function to support the government.[19]  In these cases, the Court expressly stated that it was determining the meaning of the term "tax" by looking at the "terms and purposes" of the priority statute. Likewise, *Sotelo* (albeit in the context of a discharge statute) supports the examination of the policy and purpose of the underlying statute (particularly as derived from the statute's legislative history) when distinguishing taxes from penalties.

---

[18]     The provision at issue excepted from discharge "taxes . . . which the bankrupt has collected or withheld from others as required by the laws of the United States or any State . . . but has not paid over . . . ." *Sotelo*, 436 U.S. at 274 (quoting section 17a(1)(e) of the Bankruptcy Act of 1898).

[19]     None of these cases addressed the lawful-unlawful distinction; as noted above, that distinction seems to have been added as a consideration in the functional analysis by *CF & I*.

This examination of these statutes' underlying purposes is not surprising. It is a core duty of the judiciary to determine Congress's intended meaning. *United States v. Am. Trucking Ass'ns*, 310 U.S. 534, 542 (1940) ("In the interpretation of statutes, the function of the courts is . . . . to construe the language so as to give effect to the intent of Congress."). When Congress's meaning is unclear from the face of a provision in the Bankruptcy Code, the Court must determine Congress's intent using the common tools of statutory construction, which include: looking at the rest of the subject statute, the provision's function within the Bankruptcy Code, the provision's history, and the provision's purpose and supporting policies.[20] Because *CF & I* held that Congress's choice of label must give way to a functional analysis in defining the term "tax" in § 507(a)(8), that term should be considered unclear on its face and these tools of statutory interpretation should be applied. There is no indication in *CF & I* that the Court intended to supplant these tools, which were utilized in *Anderson*, *Feiring*, *New York*, and *Sotelo* in defining "tax" as used in § 507(a)(8). To the contrary, *CF & I* incorporates these cases as setting forth the same analysis that should be employed under § 507(a)(8).

Accordingly, the Court rejects the IRS's argument that *CF & I* limits penalties to those exactions imposed on unlawful acts and rejects the IRS's argument that the courts in *Cassidy* and its progeny are out of line with *CF & I* by considering the policies underlying § 507(a)(8) in reaching their decisions. In so holding, this Court respectfully disagrees with *Juvenile Shoe*, and instead agrees with the grounds for dissent entered in that case. 99 F.3d at 903-04 (Beam, J., dissenting).

---

[20]   *See, e.g.*, *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law." (citations omitted)); *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 54 (1987) (interpreting statute in a manner consistent with Congress's "inclusion of certain remedies and exclusion of others" and noting "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies."); *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 631 (1973) (stating that one provision of statute should be construed in manner that furthers purposes of its fraternal provisions); *Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307 (1961) ("[A] word is known by the company it keeps . . . ."); *Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) ("[A statute] should be interpreted so as to effect its purpose.").

D.     *National Federation*.

Next, the IRS argues that the Supreme Court, in its landmark ruling in *National Federation of Independent Business v. Sebelius*, 132 S. Ct. 2566 (2012), "revisited" *CF & I* and created a universal definition of "tax," as distinct from penalty, that applies in all contexts, including § 507(a)(8).  According to the IRS, in *National Federation*, the Supreme Court determined (or affirmed) that a "penalty," in contrast to a "tax," is limited to an exaction imposed on unlawful conduct.  This Court disagrees with this reading of *National Federation*.

In *National Federation*, the Supreme Court was called upon to determine, among other things, whether the controversial "individual mandate"[21] in the Patient Protection and Affordable Care Act of 2010, Pub. L. No. 111-148, 124 Stat. 119 (codified in scattered sections of 21 U.S.C., 24 U.S.C., 26 U.S.C., and 42 U.S.C.) [hereinafter ACA] could be supported under Congress's enumerated powers under the Constitution. 132 S. Ct. at 2577.  The Court determined that Congress could not criminalize the failure to purchase healthcare insurance because regulation of a non-action was outside of Congress's power to regulate under the Commerce Clause (U.S. Const. art. I, § 3, cl. 3) and corollary power under the Necessary and Proper Clause (U.S. Const. art. I, § 8, cl. 18) of the Constitution. *Id.* at 2593.

The teeth of the individual mandate is the so-called "shared responsibility payment,"[22] which Congress, in numerous places in the ACA, denominated a "penalty" for an individual's failure to comply with the ACA's requirement to purchase healthcare insurance. *Id.* at 2594.  If the shared responsibility payment had been struck down as unconstitutional, the viability of the

---

[21]          **(a) Requirement to maintain minimum essential coverage.**—An applicable individual shall for each month beginning after 2013 ensure that the individual, and any dependent of the individual who is an applicable individual, is covered under minimum essential coverage for such month.

26 U.S.C. § 5000A(a).

[22]          **(b) Shared responsibility payment.**—
             **(1) In general.**—If a taxpayer who is an applicable individual, or an applicable individual for whom the taxpayer is liable under paragraph (3), fails to meet the requirement of subsection (a) for 1 or more months, then, except as provided in subsection (e), there is hereby imposed on the taxpayer a penalty with respect to such failures in the amount determined under subsection (c).

26 U.S.C. § 5000A(b).

entire ACA would have been threatened. *See, e.g.*, *id.* at 2668 (Scalia, Kennedy, Thomas, & Alito, JJ., dissenting) ("The two pillars of the Act are the Individual Mandate and the expansion of coverage under Medicaid.  In our view, both these central provisions of the Act—the Individual Mandate and Medicaid Expansion—are invalid.  It follows, as some of the parties urge, that all other provisions of the Act must fall as well.").

After determining that it was outside of Congress's commerce power to impose the shared responsibility payment as a criminal penalty, the Court accepted the government's plea to consider the payment as a tax. *Id.* at 2593-95 (majority).  The Court stated:

> The most straightforward reading of the mandate is that it commands individuals to purchase insurance.  After all, it states that individuals "shall" maintain health insurance. . . . [Because] the Commerce Clause does not give Congress that power . . . it is therefore necessary to ask whether the Government's alternative reading of the statute—that it only imposes a tax on those without insurance—is a reasonable one.
>
> . . . .
>
> Under the mandate, if an individual does not maintain health insurance, the only consequence is that he must make an additional payment to the IRS when he pays his taxes.  That, according to the Government, means the mandate can be regarded as establishing a condition—not owning health insurance—that triggers a tax—the required payment to the IRS.  Under that theory, the mandate is not a legal command to buy insurance.  Rather, it makes going without insurance just another thing the Government taxes, like buying gasoline or earning income.  And if the mandate is in effect just a tax hike on certain taxpayers who do not have health insurance, it may be within Congress's constitutional power to tax.

*Id.* at 2593-94 (citations omitted).

As *National Federation* reaffirmed, under its taxing power, Congress has broad power to regulate conduct, so long as the regulation: (1) produces at least some revenue for the government; and (2) does not have certain characteristics of criminal punishment. *Id.* at 2594-95 (noting that "the essential feature of any tax[] [is that] it produces at least some revenue for the Government," and citing *Bailey v. Drexel Furniture Co.*, 259 U.S. 20, 38-42 (1922), which held that regulation labeled "tax" by Congress and produced at least some revenue to government,

was criminal penalty, not constitutional tax, because of criminal characteristics).  The Court noted:

> The question is not whether [interpreting the shared responsibility payment to be a tax] is the most natural interpretation of the mandate, but only whether it is a "fairly possible" one.  As we have explained, "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality."

*Id.* at 2594 (citations omitted).  Thus, the Court was examining whether it could reasonably construe the characteristics of the individual mandate as sustainable under Congress's taxing power.  The question before the Court was whether it was "fairly possible" to interpret the mandate as merely a trigger for a tax payment (which would be sustainable under Congress's taxing power), rather than as an absolute command subject to criminal sanctions (which would render it unsupportable under the taxing power).

Because the Court had already held that Congress intended the payment as a penalty for the purpose of the Anti-Injunction Act, *id.* at 2582-84; *see also* 26 U.S.C. § 7421(a), the Court's first task was to show that Congress could intend for a term to have differing meanings under two different statutes, *Nat'l Fed'n*, 132 S. Ct. at 2593-95.  For this reason, the Court cited a pair of cases, one of which held that Congress intended a regulation to be a "tax" under the Anti-Injunction Act, even though the other case held that Congress intended that same regulation to have criminal characteristics that rendered it a penalty, not a tax, under the Constitution. *Id.* at 2594-95.[23]

The Court's next step was to cite cases in which it had previously upheld under Congress's taxing power exactions that Congress had labeled something other than a "tax." *Id.* at 2595 (citing *United States v. Vassar (License Tax Cases)*, 72 U.S. (5 Wall.) 462 (1866)).  The

---

[23]        Our precedent reflects this: In 1922, we decided two challenges to the "Child Labor Tax" on the same day.  In the first, we held that a suit to enjoin collection of the so-called tax was barred by the Anti-Injunction Act.  Congress knew that suits to obstruct taxes had to await payment under the Anti-Injunction Act; Congress called the child labor tax a tax; Congress therefore intended the Anti-Injunction Act to apply.  In the second case, however, we held that the same exaction, although labeled a tax, was not in fact authorized by Congress's taxing power.  That constitutional question was not controlled by Congress's choice of label.

*Nat'l Fed'n*, 132 S. Ct. at 2594-95 (citations omitted).

dissent responded by noting that it knew of no case in which the Court had upheld under Congress's taxing power an exaction that was denominated a "penalty" by statute. *Id.* at 2651 (Scalia, Kennedy, Thomas, & Alito, JJ., dissenting).  The majority countered by citing *Sotelo* to show that the Court had construed an exaction denominated as a "penalty" under one provision of the U.S. Code, as a "tax" under another provision of the U.S. Code. *See Nat'l Fed.*, 132 S. Ct. at 2595 & n.7 (majority).  The dissent took issue with the citation of this case because, "[w]hether the 'penalty' was a 'tax' within the meaning of the Bankruptcy Code had absolutely no bearing on whether it escaped the constitutional limitations on penalties." *Id.* at 2651 n.5 (Scalia, Kennedy, Thomas, & Alito, JJ., dissenting).  The majority did not consider this an insurmountable distinction because in *National Federation*, as in *Sotelo*, the Court was interpreting something Congress called a "penalty" to mean something other than its plain language. *Id.* at 2595 n.7 (majority).  To the majority, all that mattered was that the Court often "[d]isregard[ed] the designation of the exaction, [in view of] its substance and application," which is what it did in *National Federation*. *Id.* (citations omitted).[24] *Id.* at 2595.  Importantly, the majority and the dissent did not disagree that the definition of "tax" in *Sotelo* was correctly interpreted in light the underlying purpose of the provision under examination; the disagreement was over whether that analysis could be extended to the question of the constitutionality of the ACA. *Compare id.* at 2595 n.7 (majority), *with id.* at 2651 n.5 (Scalia, Kennedy, Thomas, & Alito, JJ., dissenting).

Once the majority determined that it was appropriate to treat what Congress called a "penalty" as a "tax" under the Congress's taxing power, it proceeded to distinguish two cases where the Court had redefined a labeled "tax" as a "penalty," first under the Constitution— *Drexel Furniture*—and second under another statute—*CF & I. See id.* at 2595-98.  Both cases

---

[24]    The majority called this principle—the disregard of labels in favor of function—a "functional approach;" however, nowhere did it indicate that this functional approach, generally typical of the cited cases addressing the definition of tax, was imposed identically from statute to statute or was identical to the "functional analysis" used in § 507 and its predecessor cases such as *Anderson*, *Feiring*, *New York*, and *CF & I. See Nat'l Fed.*, 132 S. Ct. at 2595.

were cited because they were helpful in determining the characteristics of penalties as distinct from taxes.[25]  The Supreme Court found it reasonable to interpret the ACA as not having these characteristics of penalties. *See id.*  It appears that the majority cited these cases to distinguish them factually, not because they represent a uniform test for the definition of "tax" and "penalty."

For example, *Drexel Furniture* presents different characteristics than *CF & I*.  The majority distinguished *Drexel Furniture* on three grounds: (1) correlation between the burden and the infraction; (2) no requirement of scienter; and (3) enforcement by the IRS. *Nat'l Fed'n*, 132 S. Ct. at 2595.  The majority distinguished *CF & I* because in that case the underlying conduct was unlawful (because of the private right of action for the underlying infraction), whereas ACA does not make failure to purchase healthcare insurance unlawful (because the ACA neither prescribes a private right of action nor dictates any legal consequences beyond liability for the shared responsibility payment). *Id.* at 2595-97.

The IRS highlights that the *National Federation* Court cited *CF & I* for the proposition that "if the concept of penalty means anything, it means punishment for an unlawful act or omission." *See id.* at 2596 (quoting *CF & I*, 518 U.S. at 224).  However, even if it is true that an exaction on an unlawful act *can never* be a tax under the Constitution, that does not necessarily mean that *every* exaction imposed upon lawful acts must be a tax rather than a penalty, particularly in the context of § 507 of the Bankruptcy Code.

To the contrary, *National Federation* affirms what the Court held in *CF & I*—Congress can mean two different things by the use of the same term in the U.S. Code.  For this reason, the characteristics of an exaction Congress termed a "penalty" in the ACA are not necessarily the exact converse of those characteristics Congress intended by using the term "tax" in § 507(a)(8)

---

[25]    As noted previously, the second part of the two-part definition of tax set forth by the Supreme Court in *National Federation* requires that the provision under examination not have criminal characteristics to a degree that render the regulation a criminal law veiled in the robes of a tax. *Nat'l Fed'n*, 132 S. Ct. at 2594-95.

of the Bankruptcy Code.[26]  Additionally, the majority in *National Federation* was applying the most lenient test reasonably possible to construe the characteristics of the ACA to be sufficiently noncriminal to render the ACA supportable as a tax under the Constitution; in doing so, the majority was not looking for the "most natural interpretation" of the ACA's characteristics, but only "a fairly possible one." *Id.* at 2594.  Accordingly, the fact that the Court concluded its analysis after examining the characteristics of penalties in *Drexel Furniture* and *CF & I* does not mean that these cases contain an exhaustive list of the characteristics of penalties in the context of the Constitution, and still less § 507 of the Bankruptcy Code.

As noted above, the IRS argues that *CF & I* was extended from its humble origins in the Bankruptcy Code to now (coincidentally) apply directly to the definition of "tax" under the Constitution.  But there is yet another reason, evident from the face of *National Federation*, which makes this interpretation impossible—the majority's examination did not consist *solely* of whether (pursuant to *CF & I*) the failure to comply with the individual mandate was unlawful. To the contrary, even though the majority determined that, on its face, failure to comply with the mandate was lawful if the shared responsibility payment was made, it examined the factors in *Drexel Furniture*—how the exaction was collected, the mechanics and amount of the exaction, and the presence of a scienter requirement. *See id.* at 2595-96.

Finally, if the Supreme Court wanted to reshape the definition of "tax" for the purpose of § 507(a)(8), it likely would not do so in such an obtuse manner.  For these reasons, *National Federation* cannot be viewed as the Supreme Court merely "revisiting" and applying *CF & I* to the ACA, such that *National Federation* now governs the definition of "tax" in § 507(a)(8) of the Bankruptcy Code.[27]

---

[26]   Note that the statutory language at issue in *National Federation* is "penalty," whereas the statutory language at issue here is "tax."

[27]   Even if this Court were convinced that the Supreme Court intended to so reshape the definition of tax in § 507(a)(8), the Court is reluctant to depart from *CF & I* and a century of interpretive history of bankruptcy priority statutes—otherwise binding precedent—based on the Supreme Court's reasoning in interpreting a statute far removed from the Bankruptcy Code. *C.f. United States v. Steed*, 548 F.3d 961, 979 (11th Cir. 2008) (stating that where prior Supreme Court holdings have been merely called into question by later interpretive Supreme Court dicta, lower courts bound to adhere to clear prior precedent).

### E.    Summary of Case Law Definition of "Tax."

*CF & I* and *National Federation* do not preclude an examination of the policy underlying § 507(a)(8) in determining whether an exaction with the primary purpose of discouraging taxpayer behavior should be considered "a pecuniary burden laid upon individuals or property for the purpose of supporting the Government."  To the contrary, *CF & I* affirms the vitality of *Anderson*, *Feiring*, *New York*, and *Sotelo*, which encourage an examination of the purposes of bankruptcy priority statutes, and *National Federation* did not alter this mandate.

*Cassidy* explains that the purpose for the differentiation between punitive penalties and taxes is two-fold: (1) punitive exactions are not vital to the support of the government and accordingly should not be given preference over ordinary creditors, and (2) giving preference to punitive exactions puts the "sting" of the deterrent on the creditors, such that the deterrent's impact is lost. *See In re Cassidy*, 983 F.2d at 164.  These policies flow from the Bankruptcy Code's overall objective in providing equal and fair distribution among creditors. *See Howard Delivery Serv.*, 547 U.S. at 657.  Further, disallowing priority to exactions with the primary purpose of discouraging debtor conduct is in harmony with § 507(a)(8)(G), which entitles to priority only penalties in compensation of actual pecuniary loss to the government. *See In re Suburban Motor Freight, Inc.*, 998 F.2d at 341 ("Had the Congress intended [the Government 'to prevail consistently against private creditors with arguably equal claims'], it would not have entitled only specifically described unsecured governmental claims to priority, but all government claims.").[28]  Even the IRS recognizes the policies underlying § 507(a)(8), succinctly summarizing them at the hearing: "[§ 507(a)(8)] is designed to protect unsecured creditors from underwriting penalties that are imposed for the bad conduct of debtors." *See* Oral Argument at 35:17-31, *Bradford v. IRS (In re Bradford)*, No. 14-11805-AEC (Bankr. M.D. Ga. April 14, 2015), ECF No. 43, https://ecf.gamb.uscourts.gov/doc1/052015686420 (attached audio file).

---

[28]    *See also Pilot Life Ins. Co.*, 481 U.S. at 54 (interpreting statute in a manner consistent with Congress's "inclusion of certain remedies and exclusion of others" and noting "[t]he deliberate care with which ERISA's civil enforcement remedies were drafted and the balancing of policies embodied in its choice of remedies"); *Weinberger*, 412 U.S. at 631 (stating that one provision of statute should be construed in manner that furthers purposes of its fraternal provisions).

Simply put, exactions not enacted primarily to preserve the government fisc should not be entitled to priority.

Accordingly, in examining whether the Exaction is a tax rather than a penalty, this Court must determine whether the primary (or dominant) purpose of the I.R.C. § 72(t) Exaction is to support the government rather than to punish or discourage certain conduct, whether it be unlawful or lawful.

## III.   Application of Law to I.R.C. § 72(t) Exaction as "Tax."

Although *Cassidy* was decided without the benefit of *CF & I*,[29] it provides a starting point for determining whether the I.R.C. § 72(t) Exaction was enacted for the purpose of government support or for the purpose of discouraging debtor behavior.[30]  This Court finds that

---

[29]    Though the Supreme Court must have examined *Cassidy* in ruling in *CF & I*, there is no clear statement by that Court that *Cassidy* appropriately stated or applied the functional analysis to I.R.C. § 72(t). *In re Cespedes*, 393 B.R. at 408 n.4 ("*Cassidy* is referenced in footnote 3 of [*CF & I*], and is discussed at length in the Tenth Circuit's *CF & I* decision directly before the Court.").  Rather than interpreting the Court's silence in regard to *Cassidy* as tacit approval, this Court examines *Cassidy* independently. *C.f. In re Cespedes*, 393 B.R. at 408 ("Further, the Court was aware of the Tenth Circuit's decision in *Cassidy*, but it chose not to criticize the court's conclusion in that case or to draw any distinctions.").

[30]    The Debtors ask the Court to adopt *Cassidy* in total.  However, there are areas where the Court would depart from *Cassidy*. For example, *Cassidy* addressed the government-support test in the phraseology of the *Lorber/Feiring* test—"for public purposes, including the purposes of defraying expenses of government or undertakings authorized by it." *In re Cassidy*, 983 F.2d at 163. From the Court's review, it appears that the *Lorber/Feiring* test expanded Supreme Court precedent without justification.  The actual language of *Feiring* is "for the purpose of defraying the expenses of government or of undertakings authorized by it," elsewhere stated in that case as, "[a] pecuniary burden . . . laid upon the bankrupt . . . for the support of government." 313 U.S. at 285, 287. *Feiring* simply does not contain the broad "public purposes, *including* [government support]" language found in *Lorber*.  Courts have, understandably, found this broader phraseology confusing. As the United States Court of Appeals for the Sixth Circuit stated:

> What is left is the single question of whether money demanded by the Government is to be put toward "public purposes," including "defraying the expenses of government." Needless to say, all money collected by the Government goes toward defraying its expenses, and is used for public purposes.  The threat of the *Lorber* reasoning, then, is that the Government automatically wins priority for all money any debtor owes it, regardless of the nature of the payments.
>
> This is not an idle fear.  The Fourth Circuit . . . picked up the "public purpose" theme and ran with it in *Williams v. Motley*, 925 F.2d 741 (4th Cir.1991).  In that case, Virginia charged motorists who were attempting to register a car, but who had not purchased private auto insurance, an "uninsured motor vehicle assessment" fee.  The court held the fee to be a "tax" for bankruptcy purposes since the fee "creates a fund that benefits the general public by reducing the overall cost of . . . insurance." *Id.* at 744. We believe that *Williams* amply illustrates the danger that overemphasis on the "public purpose" element will eliminate all distinction between "taxes" and "fees" or other money owed the Government, enabling the Government to prevail consistently against private creditors with arguably equal claims. This would turn on its head the traditionally egalitarian manner in which the Bankruptcy Code has dealt with competing creditors, who by definition fight over very limited assets. Had the Congress intended such a result, it would not have entitled only specifically described unsecured governmental claims to priority, but all government claims.

the I.R.C. § 72(t) Exaction was enacted to deter debtor conduct rather than to support the government.  While the IRS admits the I.R.C. § 72(t) Exaction's deterrent purpose, it argues that: (1) the presence of the deterrent purpose is irrelevant so long as it is mixed with a revenue purpose; and (2) the deterrent purpose is not dominant over Congress's revenue purpose and secondary purpose of encouraging to taxpayers to save (in distinction from deterring early withdrawal).

In the Court's view, where an exaction arguably serves more than one purpose, it is necessary to address the primary (or overriding) purpose of the exaction. *See Mahon v. IRS (In re Unified Control Sys., Inc.)*, 586 F.2d 1036, 1036 (5th Cir. 1978) (examining "sole substantial purpose" of exaction).[31]  In effect, the IRS, citing *National Federation*, argues that when an exaction has multiple purposes, one to raise revenue and one to deter conduct, the Court should ignore the nonrevenue purpose because "taxes that seek to influence conduct are nothing new." *Nat'l Fed.*, 132 S. Ct. at 2596.  However, as noted above, the *National Federation* Court made this statement in the context of determining whether Congress intended the shared responsibility payment to have the characteristics of a tax rather than a penalty under the Constitution, not whether the shared responsibility payment should be entitled to priority under § 507(a)(8).

---

*In re Suburban Motor Freight, Inc.*, 998 F.2d at 341. *See also In re Freymiller Trucking, Inc.*, 194 B.R. 914, 916 (Bankr. W.D. Okla. 1996) ("Under the [the *Lorber/Feiring*] definition most, if not all, judgments obtained by governmental units would meet the definition of a 'tax'. . . .  No one, however, would reasonably conclude that ordinary judgments obtained by governmental units are 'taxes' and, as such, entitled to bankruptcy priority.").  Notably, the Supreme Court in *CF & I* chose not to use the broad "public purposes" language found in *Lorber*, even though that was the language used by the Tenth Circuit in the opinion below. *United States v. Reorganized CF & I Fabricators of Utah, Inc. (In re CF & I Fabricators of Utah, Inc.)*, 53 F.3d 1155, 1158 (10th Cir. 1995) *vacated sub nom.* 518 U.S. 213 (1996).

Additionally, whereas *Cassidy* analyzed the policy and purpose of § 507(a)(8) separately from the concept of government support (the "public purposes" factor under *Lorber/Feiring*), this Court considers the policy and purpose of § 507(a)(8) as helpful in understanding that the degree to which exactions are imposed to deter conduct, they are (to the same degree) not imposed to support the government.

Finally, as noted herein below, the Court disagrees with the conclusion of the *Cassidy* court that the legislative history of I.R.C. § 72(t) does not reveal a dominant purpose for the enactment of that statute.

[31]    *Unified Control Systems* is binding precedent on this Court to the degree it has not been abrogated by intervening decisions from the Supreme Court and the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) ("We hold that the decisions of the United States Court of Appeals for the Fifth Circuit . . . , as that court existed on September 30, 1981, handed down by that court prior to the close of business on that date, shall be binding as precedent in the Eleventh Circuit, for this court, the district courts, and the bankruptcy courts in the circuit.").  [32]   *See Juvenile Shoe*, 99 F.3d at 902 (quoting *Sonzinsky* for proposition that because "a tax is not any less a tax because it has a regulatory effect" court should ignore nonrevenue purposes in determining whether exaction is "tax" under § 507(a)(8)).

While the IRS is supported by *Juvenile Shoe*'s similar statement made in regard to *Sonzinsky v. United States*, 300 U.S. 506, 513 (1937),[32] in the Court's view, *Juvenile Shoe* is similarly in error. *National Federation* and *Sonzinsky* (and the cases these decisions cite) merely reaffirm the well-established principle that, for a regulation to be supportable under Congress's taxing power, Congress need not intend for the regulation to produce revenue so long as does so in fact. This constitutional principle does not apply in defining the term "tax" in the Bankruptcy Code.

The Court also disagrees with the IRS's contention that the revenue purpose of the I.R.C. § 72(t) Exaction is dominant. In addressing this contention, the Court looks first to the legislative history of I.R.C. § 72(t) and then examines several relevant Supreme Court cases. According to *Cassidy*, the legislative history of I.R.C. § 72(t) indicates several purposes—"to prevent retirement plans from being treated as savings accounts, to recapture a measure of tax benefits that have been provided prior to the withdrawal, and to deter the use of retirement funds for nonretirement purposes." *In re Cassidy*, 983 F.2d at 164. While all of these purposes are present in some degree or another, the Court believes that they are not all equally so; in the Court's opinion, *Cassidy*'s summary underemphasizes the I.R.C. § 72(t) Exaction's overriding deterrent purpose.

The legislative history cited (but not quoted) by the court in *Cassidy* states in relevant part:

### Reasons for Change

> Present law imposes withdrawal sanctions with respect to certain tax-favored retirement arrangements and requires withdrawal restrictions to be provided under others. The absence of withdrawal restrictions in the case of some tax-favored arrangements allows participants in those arrangements to treat them as general savings accounts with favorable tax features rather than as retirement savings arrangements. Moreover, taxpayers who do not have access to such arrangements, in effect, subsidize the general purpose savings of those whose employers maintain plans with liberal withdrawal provisions.

---

[32] *See Juvenile Shoe*, 99 F.3d at 902 (quoting *Sonzinsky* for proposition that because "a tax is not any less a tax because it has a regulatory effect" court should ignore nonrevenue purposes in determining whether exaction is "tax" under § 507(a)(8)).

Although the committee recognizes the importance of encouraging taxpayers to save for retirement, the committee also believes that tax incentives for retirement savings are inappropriate unless the savings generally are not diverted to nonretirement uses. One way to prevent such diversion is to impose an additional income tax on early withdrawals from tax-favored retirement savings arrangements in order to discourage withdrawals and to recapture a measure of the tax benefits that have been provided. Accordingly, the committee believes it appropriate to apply an early withdrawal tax to all tax-favored retirement arrangements. For the same reasons, the committee believes it is appropriate to limit the extent to which participants may make hardship withdrawals from a qualified cash or deferred arrangement.

Moreover, the committee is concerned that the present-law level of the additional income tax appears in many instances to be an insufficient deterrent to the use of retirement funds for nonretirement purposes, because for taxpayers whose income is taxed at a higher marginal rate, the sanction may be neutralized by the taxfree compounding of interest after a relatively short period of time, particularly with respect to amounts contributed to a retirement arrangement on a before-tax basis. Accordingly, the committee believes it to be appropriate to increase the tax from 10 to 15 percent . . . . The committee recognizes that actual retirement may commonly commence before age 59-1/2 in some industries and, therefore, provides an exception to the tax for the early commencement of a participant's benefits. The committee also believes it appropriate to provide, under limited circumstances, an exemption from the tax for certain withdrawals on account of specified hardships.

. . . .

Finally, the committee recognizes that the present-law prohibition on distributions from qualified cash or deferred arrangements upon plan termination imposes significant administrative burdens on the trustees of such plans who must administer the related trust until all participants have retired or separated from service.

S. Rep. No. 99-313, at 612-13 (1978).[33]

---

[33] Neither party has directed the Court to any relevant legislative history other than that cited in *Cassidy*. Through its own research, the Court discovered H.R. Rep. 99-841, at 452-58 (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4541-48, 1986 WL 31988. The Conference Report does not appear to express a different intent from the Senate Report as to I.R.C. § 72(t) and generally follows the Senate's suggestions therein. H.R. Rep. 99-841, at 455 (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. at 4543. The only relevant difference appears to be that the Conference did not follow the Senate's recommendation of a 15% exaction, though without expressing any reason. *Id.*

This history shows that the I.R.C. § 72(t) Exaction was designed to put IRAs on the same plane as other retirement plan structures by creating comparable "sanctions."  Congress's primary goal in creating the 10% exaction on all tax-preferred retirement mechanisms was to discourage spending of tax-preferred retirement funds, regardless of type, in a way it did not deem appropriate. *See, e.g.*, *id.* ("[T]he committee also believes that tax incentives for retirement savings are *inappropriate* unless the savings generally are not diverted to nonretirement uses." (emphasis added)), ("[T]he additional income tax appears in many instances to be an insufficient *deterrent* to the use of retirement funds for nonretirement purposes . . . ." (emphasis added)).

Although there is one phrase in this legislative history indicating a recognition that the exaction might allow the "recapture" of some lost tax revenue, that single reference pales in comparison to the lengthy and detailed discussion concerning the anticipated deterrent impact of the law.  This slight indication that Congress contemplated some revenue benefit from the exaction on these "inappropriate" tax benefits is not a sufficient basis to hold that the provision has the root purpose of supporting the government.[34]

It is worth noting that the only people subject to the I.R.C. § 72(t) Exaction are those who withdraw their retirement funds for a purpose deemed inappropriate by Congress.  As noted above, there are so-called "hardship" exceptions to the early withdrawal rule—exceptions for distributions made after a taxpayer's death or disability, to pay for a taxpayer's medical expenses, to help pay for a taxpayer's first home, and to satisfy a state order of domestic support or property settlement, among others.  Those that have a reason for their early withdrawal deemed appropriate by Congress are not subject to the exaction.  This seems incongruous with the proposition that Congress's purpose was to raise revenue, but it fits with this Court's

---

[34]   This exaction stands in sharp contrast to certain depreciation recapture provisions in the Tax Code, which also address temporary tax benefits later lost.  In general, these recapture provisions are designed so that the taxpayer has to pay whatever tax the taxpayer would have paid at the time of the tax deferment (without accounting for the time value of money) and does not have to pay an exaction on top of that. *See, e.g.*, 26 U.S.C. §§ 1239 (gain recognized by disposition of property to related party recognized as ordinary income), 1245 (recapturing depreciation deductions on depreciable personal property as ordinary income upon its disposition), 1250 (similar provision regarding real property deductions in excess of straight-line).

conclusion that the main purpose of the provision is to deter conduct of which Congress disapproves.

Further, the legislative history indicates that the percentage of the exaction is attuned to a level, not to obtain maximum revenues, but to discourage early withdrawal. Judging by the legislative history, the revenue effect of raising the percentage of the exaction was not even a consideration. In short, Congress's mere cognition that the I.R.C. § 72(t) Exaction might generate some revenue is not sufficient to hold that the primary purpose of the I.R.C. § 72(t) Exaction is unclear; its primary purpose is clear—the deterrence of inappropriate uses of retirement savings. Even if, as suggested in *Cassidy*, Congress had several purposes in enacting the I.R.C. § 72(t) Exaction, the deterrent purpose is noticeably dominant.

Second, the Supreme Court, in addressing IRAs in other contexts, has expressly called the I.R.C. § 72(t) Exaction a penalty, and has relied on the I.R.C. § 72(t) Exaction's strong deterrent function to make significant determinations under the Bankruptcy Code. For example, in *Rousey v. Jacoway*, the Supreme Court held that IRA funds were exemptible under § 522(d)(10)(E), as "a payment under a . . . plan or contract on account of illness, disability, death, age, or length of service, to the extent reasonably necessary for the support of the debtor and any dependent of the debtor." 544 U.S. 320, 322-24 (2005) (quoting 11 U.S.C. § 522(d)(10)(E)). The Court rejected the trustee's argument that the IRA funds could not constitute payments "on account of" the conditions specified in § 522(d)(10)(E) because the funds could be withdrawn freely, though subject to the 10% I.R.C. § 72(t) Exaction. *Id.* at 327. The Court reasoned:

> That right is restricted by a 10-percent tax *penalty* that applies to withdrawals from IRAs made before the accountholder turns 59 ½. Contrary to [the trustee's] contention, this tax *penalty* is substantial. The deterrent to early withdrawal it creates suggests that Congress designed it to preclude early access to IRAs. The low rates of early withdrawals are consistent with the notion that this *penalty* substantially deters early withdrawals from such accounts. Because the 10-percent *penalty* applies proportionally to any amounts withdrawn, it prevents access to the 10 percent that the [debtors]

31

> would forfeit should they withdraw early, and thus it effectively prevents access to the entire balance in their IRAs. It therefore limits the [debtors'] right to "payment" of the balance of their IRAs. And because this condition is removed when the accountholder turns age 59 ½, the [debtors'] right to the balance of their IRAs is a right to payment "on account of" age. The [debtors] no more have an unrestricted right to payment of the balance in their IRAs than a contracting party has an unrestricted right to breach a contract simply because the price of doing so is the payment of damages. Accordingly, we conclude that the [debtors'] IRAs provide a right to payment on account of age.

*Id.* at 327-29 (internal citations omitted) (emphasis added); *see also id.* at 327 n.1 (citing statistics as to effectiveness of I.R.C. § 72(t) Exaction).

In addition, in *Clark v. Rameker*—where the Supreme Court recently held that inherited IRAs are not "retirement funds" exempted from the debtor's estate under § 522(b)(3)(C)—the Court stated:

> To ensure that . . . IRAs are used for retirement purposes and not as general tax-advantaged savings vehicles, Congress made certain withdrawals from both types of accounts subject to a 10 percent *penalty* if taken before an accountholder reaches the age of 59 ½.
>     . . . .
> Whereas a withdrawal from a traditional or Roth IRA prior to the age of 59 ½ triggers a 10 percent tax *penalty* subject to narrow exceptions—a rule that encourages individuals to leave such funds untouched until retirement age—there is no similar limit on the holder of an inherited IRA.

134 S. Ct. 2242, 2246-47 (2014) (internal citations omitted) (emphasis added). The absence of the deterrent created by the I.R.C. § 72(t) Exaction, among other things, persuaded the Court that inherited IRAs should not be considered "retirement funds." *Id.* at 2247-48.

These cases, though not decided in the context of § 507, evidence the common, and common-sense, understanding of I.R.C. § 72(t): it is designed to, and in fact does, function as a penalty to deter the inappropriate (early) use of retirement savings. According to these cases, this penalty is quite effective; accordingly, it provides very little revenue to the government.

The IRS's alternative argument—that Congress is not discouraging the waste of retirement savings, but rather encouraging saving—self-destructs upon serious examination.

This appears to be a distinction without a difference.  It is hard to see how a deterrent on spending past-saved amounts encourages future saving.  Moreover, even if Congress's purpose is to encourage saving, that is still not the purpose mandated by *CF & I* in its definition of "tax"— government support.

As an additional argument, the IRS asserts that the I.R.C. § 72(t) Exaction is imposed on conduct that diminishes government tax revenues, and accordingly is not imposed on "revenue-neutral" conduct, like the I.R.C. § 4971 Exaction addressed in *CF & I*.[35]  The IRS cites *Juvenile Shoe* in support of the importance of this distinction.  This characteristic does not appear to have been considered by the Supreme Court in defining "tax" under § 507(a)(8) (certainly, the *CF & I* Court did not mention this characteristic in reaching its decision).  Further, this distinction seems to fit better in a discussion of whether an exaction is a penalty in compensation of actual pecuniary loss to the government than in determining whether it is a tax with the purpose of supporting the government.  However, the Court need not pursue these concerns further because the Court disagrees with the IRS's conclusion that the I.R.C. § 72 Exaction, unlike the I.R.C. § 4971 Exaction, is imposed only on conduct that has an effect on government revenue.

The IRS argues that traditional IRAs shield ordinary income from taxes in the short-term, which is revenue-negative to the government, at least in the years of those contributions.  The Court rejects this argument for several reasons.

First, the IRS seems to be looking at the wrong conduct in comparing revenue-effect; the I.R.C. § 72(t) Exaction is not imposed on making IRA contributions, but rather on the *withdrawal* of those contributions.[36]  The Court fails to see how the early withdrawal of IRA funds has any negative revenue impact on the government.  The IRS argues that the government

---

[35]   The I.R.C. § 4971 Exaction is imposed on employer's underfunding a pension plan.  The IRS correctly asserts that the underfunding of a pension plan is revenue-neutral to the government.  A pension plan has an effect on the government fisc only when the employer claims a tax deduction for the amounts contributed to the plan.  In other words, the revenue effect occurs upon the funding, rather than the underfunding, of a pension plan.

[36]   The IRS's examination of the IRA contributions (as conduct receiving a tax-benefit), rather than examining the withdrawal of these contributions (the event triggering the exaction) is arguably supported by *Juvenile Shoe*'s similar examination of tax deferment in the context of pension plan contributions. *See* 99 F.3d 901, 903.  The Court finds *Juvenile Shoe* distinguishable, however, as explained *infra*.

suffers the loss of not being able to tax the growth of the investment fund that, according to the

IRS, would have occurred from the date of early withdrawal until an appropriate withdrawal date

(e.g., reaching 59 ½ years of age).  In addition to presuming future growth in the early withdrawn

IRA accounts, this argument overlooks the benefit that the government obtains by receiving the

ordinary income taxes (triggered upon the early withdrawal) earlier than it would have had the

IRA funds been withdrawn upon retirement age.  Generally (and simplistically) speaking, the

concept of the time-value of money recognizes that a lesser amount collected on an earlier date

can be worth as much (or more) than a greater amount collected at a later date.  The IRS has

apparently failed to account for this concept.[37]

Second, even assuming that the contribution to the IRA is the correct conduct to examine

in comparing revenue effect, the I.R.C. § 72(t) Exaction does apply to revenue-neutral conduct,

contrary to the IRS's contention.  As for traditional IRAs, although the government does have an

immediate negative revenue effect in forgoing the taxation of the contributed amounts, this effect

seems to be offset by the greater taxes that the government will (presumably) later collect upon

the distribution of the fund's growth.[38]  In this way, the I.R.C. § 72(t) Exaction can be

distinguished from the Self-Reversion Exaction in *Juvenile Shoe*.  That court was concerned that:

> As the pension fund grows, it includes earnings on the money that
> would have been taken as tax revenue at the corporate tax rate had
> it not been placed in the pension fund.  Although the employer must
> pay the corporate tax rate on funds reverted from the pension plan,
> the employer earns interest while the funds are in the pension plan,
> and the government is denied the use of the tax revenue during the
> same period forcing the government to borrow from other sources
> to fund its operations.  Capturing the tax benefit the employer
> received at the expense of the government has the same purpose and
> similar effect as assessing the tax prior to the employer's placement
> of the funds in the pension plan.

---

[37]    While the rate of return obtained in a taxpayer's IRA may be higher than the rate of return that the government can
otherwise obtain, the Court has a hard time accepting that Congress viewed this potential benefit as a means of substantial
government support.

[38]    The IRS presented no reason why the government's cost of capital is not matched or exceeded by the growth rate of an
average taxpayer's IRA.

99 F.3d at 901 (citations omitted).  In other words, absent any additional regulation (such as the

Self-Reversion Exaction), an employer could defer tax by depositing funds into such a pension

fund and later withdrawing them subject to the exact same tax that it would have incurred had

the tax not been deferred.  While such an employer would thereby be deprived of the interest on

the funds for its regular obligations, the interest accrued in the pension fund would still

presumably benefit the employer by fulfilling a portion of the employer's long-term pension

obligation.  Such a mechanism could be used to defer revenue recognition indefinitely (so long

as the employer had no need for the funds), allowing the employer to defer revenue recognition

until an advantageous time (such as a year with offsetting deductions).  Under the pension plan at

issue in *Juvenile Shoe*, at no point was an employer certain to withdraw the fund's growth (thus

giving the government an opportunity to impose ordinary tax on the growth).[39]  That is not the

case with an IRA.  The principal and growth in an IRA must eventually be distributed.[40]  When

distributed from a traditional IRA, the funds will be subject to income tax.

     Roth IRAs are even more troublesome under the IRS's argument.  Roth IRAs, as noted

by the counsel for the IRS, are funded with a taxpayer's post-tax dollars. 26 U.S.C. § 408A(c)(1).

Accordingly, Roth IRA contributions do not diminish government revenue in the year in which

they are made.[41]  The I.R.C. § 72(t) Exaction is imposed on a non-qualified withdrawal from a

Roth IRA, just as a traditional IRA. 26 U.S.C. § 408(d)(1); Treas. Reg. § 1.408A-6, Q&A (5);

*see also Kitt v. United States*, 288 F.3d 1355, 1358 (Fed. Cir. 2002) ("Under the new rule,

therefore, § 72(t) applies to non-qualified withdrawals from either traditional IRAs or Roth

---

[39]    Such pension growth would normally be distributed to pension plan participants, in which case the employer would pay no tax on it.

[40]    If at no other time, it will be distributed as an inherited IRA. *See Clark*, 134 S. Ct. at 2247.

[41]    While Roth IRAs, by shielding the account's growth from tax, are arguably revenue-negative to the government in the years prior to withdrawal, a nonqualified withdrawal subjects such an account's growth to tax, *see* 26 U.S.C. § 408A(d); Treas. Reg. § 1.408A-6, Q&A (4), which should offset any such revenue-detriment to the government, *see* note 38 and accompanying text.

IRAs."). Thus, the I.R.C. § 72(t) Exaction, despite the IRS's contention, does apply to revenue-neutral IRA contributions.[42]

In conclusion, construing § 507 narrowly (as directed by the Supreme Court) to effectuate its purpose in providing equal distribution to similarly situated creditors, the Court concludes that the primary purpose and function of the I.R.C. § 72(t) Exaction is not to support the government, but rather to deter an "inappropriate" use of tax-preferred retirement accounts. Accordingly, the I.R.C. § 72(t) Exaction is not a "tax" within the meaning of § 507(a)(8)(A) – (F).

## IV.     Application of Law to I.R.C. § 72(t) Exaction as "Penalty."

In the alternative, the IRS argues that the Exaction, if a penalty, is one entitled to priority as compensation of the government's actual pecuniary loss. The IRS's arguments here overlap with those discussed above. First, it is argued that the exaction recoups a loss to the government incurred through the taxpayer's deferment of income recognition by contributing the income to a traditional IRA. And, second, it is argued that the exaction recoups the greater amount of taxes that the government would have collected had the IRA fund been allowed to grow until the taxpayer reached retirement age.

In addressing these arguments above in the regard to the definition of "tax," the Court has already shown that the government appears to sustain little (if any) loss under either scenario posed by the IRS. Accordingly, these claimed losses do not constitute the *actual* pecuniary loss to the government required by § 507(a)(8)(G). Further, as noted by *Cassidy*, the I.R.C. § 72(t) Exaction has no relation to either claimed loss;[43] the percentage of the I.R.C. § 72(t) Exaction is the same whether the funds were withdrawn at age 35 or age 59—10%.[44] *See Cassidy*, 983 F.2d

---

[42]     Even if the IRS were correct that the I.R.C. § 72(t) Exaction is imposed only on revenue-negative conduct, this would not alter the Court's opinion that the I.R.C. § 72(t) Exaction has the primary purpose and function of deterring early withdrawal, not supporting the government.

[43]     The IRS neither explained an approximation between the 10% exaction and the lost tax-on-IRA-growth value nor explained how the speculated interest growth is not offset by the government's earlier enjoyment of the tax on those funds. *See* note 37 and accompanying text.

[44]     In other words, a withdrawal made just one day before retirement age is going to cost the taxpayer holding a traditional IRA 10% of the principal and growth thereon, just as it would cost the taxpayer 10% of the principal and growth thereon as to funds withdrawn 30 years prior to retirement. The losses to the government in these scenarios (assuming the IRS's argument is correct that the government loses money because of stunted fund growth) are clearly disparate. A withdrawal made one day early would

at 165.  Further, as noted above, the I.R.C. § 72(t) Exaction is imposed on Roth IRAs even though the government ordinarily expects no tax from these funds and their growth.  Not only is the I.R.C. § 72(t) Exaction imposed upon a non-qualified distribution from a Roth IRA, but it is imposed on top of possible income taxes also imposed on the fund's growth. *See* 26 U.S.C. § 408A(d); Treas. Reg. § 1.408A-6, Q&A (4), (5).  In such a situation, the government has suffered no actual loss, yet the I.R.C. § 72(t) Exaction applies.

Importantly, § 507(a)(8)(G) entitles to priority only penalties that are in compensation of *actual* pecuniary loss to the government.  The Court is not convinced that the I.R.C. § 72(t) Exaction was designed to, or in fact does, compensate the government for any comparable, demonstrable *actual* pecuniary loss.  For these reasons, construing § 507(a)(8)(G) narrowly as directed by the Supreme Court, this Court joins the other courts that have addressed this question and determined that the I.R.C. § 72(t) Exaction is not a penalty in compensation for actual pecuniary loss under § 507(a)(8)(G). *See In re Cassidy*, 983 F.2d 164-65; *In re Cespedes*, 393 B.R. at 409; *see also Mournier*, 232 B.R. at 194.

**V.     Conclusion.**

Therefore, because the Exaction is neither a tax nor a penalty in compensation for actual pecuniary loss under § 507(a)(8), it is not entitled to priority in the Debtors' case, and the Court sustains the Debtors' objection to the IRS's claim.  An order consistent with this Opinion will be entered on even date herewith.

---

seem to have only a miniscule effect on government revenue (i.e., only the lost tax revenue on one day's growth), whereas (assuming the IRS's position) the withdrawal made 30 years early would cause a great decrease to government revenue (i.e., the lost tax on 30 years of growth), yet the 10% exaction applies with full force in either situation.  Presuming growth in the fund, the exaction in absolute terms would be much more severe on the withdrawal made one day before retirement than the withdrawal made 30 years early.